The last case on our agenda for this morning is N. G. v. Placentia Yorba Linda Unified The last case on our agenda for this morning is N. G. v. Placentia Yorba Linda Unified Good morning, your honors. My name is Colleen Snyder, and I have with me at council table Ms. Christian Knox, also an attorney in this matter. We represent the appellants N. G., R. G., and G. G. May it please the court, I'd like to reserve two minutes for rebuttal. There were many errors made by the lower courts in this case, and I'd like to focus on three areas that I consider to be the most egregious or glaring errors today. Number one was my after the settlement agreements expired on December 31st, 2016. The second area relates to the district's obligations to N. G. as of January 1st, 2017. And the third is in regards to the defects of the June 22nd, 2017 prior written notice. As to the first two, if I'm not mistaken, they both operate off a common premise, which is that the settlement agreement didn't say, you've given up your rights to challenge the 2016 IEP. Is that fair? Correct. Tell me, I've read the agreement, and that seems to me to be a reasonable interpretation of it. Why isn't that so? Well, because each of the agreements had a specific end date for the term of the waivers that my clients bargained for. I don't understand it. The agreement wouldn't make sense. They would just be, the agreements were signed, I think, on June 27th, 2016. They covered any deficiencies in what went before, and that they gave you a bundle of money, and then that release that they got lasted six months? Yes. So the first agreement was actually executed in January, 2016. I know, but the last one was on- The last- One of them, I think the last one was on June 27th. That was- That was extended. Correct. That was- And pursuant to your request, and I don't remember now, did they give you more money? Not in the June 2016 one. In any event, your construction doesn't make any sense. There wouldn't be no point in giving you a bundle of money in general for a lease that would last for six months, and then you could sue them in six months. Aside from the language of it, it doesn't make any sense to me. Well, because the waiver was for, in exchange for a release of all claims against the district through December 31st, 2016. But those claims arose from, the reason that you got in a dispute with the district was you didn't like the April 2016 IEP, right? Well, actually, the dispute arose prior, but yes, that's- That was part of the dispute. Yes. And the district said, well, all right, let's settle all this up. We'll give you some money. We'll give you some more later, they say, to finance NG's education someplace else. And in return, let's drop all your claims. And it didn't seem to me, it wouldn't seem to make sense to say, we'll give you some money, defer all your claims until the last day of the agreement, and then bring them again. That doesn't strike me as a reasonable interpretation of the agreement. Well, Your Honor, respectfully, that's not what my clients did. They brought claims, they did not bring claims regarding the settled period. No, but they want to bring claims regarding the 2016 IEP. Yes. And it seems to me that's precisely what the school district paid money to settle. If the 2016 IEP was going to be challenged, why in the world would they give you money? Well, for one, the 2016 IEP wasn't even in creation yet at the time of the first agreement. The first agreement was in January 2016, and it contained a provision that said the parties will meet in April. And it contained, in effect, a holdover provision, did it not? Make an offer, and it had even a provision that if there's a dispute about that offer, what would happen? So the terms of the agreement even evidenced the fact that the parties anticipated there could be a further dispute, and it laid out what would be what's called the stay put placement in the event of a dispute. So what would be parents' fallback? Subsequent agreements were made after the April meeting. Correct. And they actually made an offer of a placement at the April meeting, and your client didn't accept it. Correct. Yes. And so... As far as I could see, there was nothing wrong with the offer that they made. I understand your client's position, your client's between a rock and a hard place here, not being able to care for the child at home because of the aggressive and self-abusive behaviors, which were being addressed, according to the record, at the local non-public school, which the were caused by the terribly self-abusive and aggressive behaviors, particularly as it affected their ability to deal with their other autistic child. So on the one hand, they wanted the child in a group home because they probably couldn't live with the situation as it was. On the other hand, the school, which the education they were getting, and the way the school dealt with the self-abusive and aggressive behaviors was making significant progress. And on the other hand, in the end, the school in Kansas was terrible. Well, those are all facts that are... Because the child was engaging in horrible self-abusive behavior, which, particularly with respect to the headbanging, could do lifelong damage. And actually, the headbanging and those serious injuries were all sustained at the Speech and Language Development Center. At HeartSprings, she did not sustain those kind of injuries. As far as I could tell, the injury she sustained to her head was when she hit her head against a bus on one occasion, and the center dealt with it. And that was the only incident. And that seemed to me to provide the... I hate to use a pejorative term, the excuse for saying we want her to have a residential placement. That's not entirely accurate. So in the record, there are five additional head injuries that she sustained after that first incident on the bus that you just mentioned. I'm still not clear. Let's assume for a moment that the release covers any challenge to the 2016 IEP. And for the period between January and April, when that IEP would have expired, where was your client? She remained at HeartSprings. Where her parents wanted her. On a unilateral parental placement. Right. So where her parents wanted her to be. Correct. So weren't any challenges to the 2016 IEP at that point, even if the agreements expired at the end of December, moot? In other words, you said, rather than the 2016 IEP, we would rather place this child in a school in Kansas. And the district settled with you and said, fine, we'll finance part of that. The beginning of 2016, you still want the child in a school in Kansas. You don't want the 2016 IEP. Beginning of 2017. 17, I'm sorry. Correct. And so she remains there. So I'm trying to figure out what challenge, why the challenge to the IEP, even if not waived, isn't moot? Well, at one, it was at parents' expense. So parents bore the cost of the education. It was not free as the law guarantees. So it's really the cost of those three months. Correct. January through April. Okay. And that leads me to a question I wanted to ask both sides. NG is now 21? 22. 22. So what we're really, what this case is really about, I don't mean to denigrate it anyway, is about money. At this point, yes, unfortunately. How much money is it about? About $200,000 that my clients are out still to HeartSpring. Would this case benefit from mediation? We were, we've been open to that, but that was not, the other side has not been open to that. Okay. So am I right that we review the determination that a residential placement wasn't necessary for clear error? I think it's a de novo review. I think under Ashland School District, it's considered a fact determination that we review for clear error. And so what I'm having trouble with here is, if we review it for clear error, then first I'm having trouble figuring out how it would be clear error for the court, the ALJ, to have found that NG was doing better at the local school than at the residential placement. Maybe you could debate that, but I don't know how it's clear error. And if we take that just as a premise for a moment, then it seems to me that your other arguments sort of don't even need to be decided, like whether there was a waiver from the settlements doesn't matter, because if ultimately you can't show she needed a residential placement, then there's, any error is harmless. And that also seems true about like whether more IEPs were needed. A lot of these procedural arguments that you're pressing seem to just fall away if we can't really reverse the ultimate determination about whether a residential placement is needed. So that's kind of how I'm thinking about this, and if I'm making a mistake, could you correct me? Yeah, so I think, well, one, my understanding is that mixed questions of law, that this would be a mixed question of law and fact. Yeah, I might have thought that, but I think our case law is the opposite. It doesn't say that, so I hear you that in general principles that might be how it works, but I don't think that's what our law says. Okay, so even under that standard, the judge below did not determine whether the IEP as of April 2016 remained appropriate to meet NG's needs as they were as of January 1st, 2017. Well, but he did find, and this is the, he or she did find, and this is the question I think Judge Friedman was asking, that at the time, for the next year going forward, for the 2017, a residential placement was not required. At what time, Your Honor? At the time that the, as I understand, the ALJ said you waived your other claims. Correct. But now we're looking at the 2017 IEP. As of April 2017. Right, and as of that point, he says, residential placement is not required, reviewing a bunch of facts and a bunch of history in the case. You may dispute those, but if we, was that finding as of April 17 clearly erroneous? Yes, so. Why? Looking at, and I'm talking about the ALJ here. Yes, yes, yes, of course. Yes, so she, she looked, if you actually, if you look at the, her analysis, she, all of her information was based on what NG's needs as of April 2016, and her whole analysis centered on why SLDC, which was the non-public school that the district had offered back in April 2016, why that was adequate to meet her needs at that time. There was no focus on, okay, what are her needs now as of January 1st, 2017, and she held, the ALJ herself held that her, she had, her behavior needs had actually increased since that time, and she did recognize that there were some. Based on, I mean, maybe I'm misunderstanding or misremembering, but wasn't that based on the idea that she was doing really badly at the residential placement? I don't think she was doing really badly. I think that's unfair. She, the ALJ did say that she made progress in some areas, but yes, she still, there's no hiding from the fact that she still had serious behavioral issues. However, one of the problems with this was that- It got worse over time. Well, I was just, yeah, so I was just going to say that one of the issues was that the way that the two agencies were keeping behavioral data was different, and so it's not like you're actually comparing apples to oranges because the Speech and Language Development Center was recording behavior based on episodes, so one instance of NG, you know, hitting her head, say, 100 times would count as one episode, whereas HeartSpring was recording each headbang as an episode. So that could have, you know, been some of the reason for the discrepancy in the behaviors. But did you argue that to the ALJ? I mean, it seems like the ALJ wasn't persuaded by that, and the ALJ is a fact finder and an expert on this topic, so I'm not sure how we can disagree. I mean, I think it's a good argument, and someone could have said exactly what you just said, they're taking the data differently. Maybe what's going on is her condition is getting worse, totally unrelated to where she is. There are a lot of things that could explain why actually a residential placement is needed, but I assume you made those arguments and the ALJ didn't agree. She noted that in a footnote, but she didn't really make any comment about it. She just said that, you know, she recognized that that was a discrepancy. And I think the crux of it is— She was getting worse. It was cyclical, so there were times that it improved. From the time she entered until the period when they made this, one would expect problems during the first period, but over the course of the time that she was there, even by accepting your analysis, that even by their own method of counting, she was getting worse. So I believe that in the classroom, her behaviors actually were decreasing, but I think in the group home, or in the residential setting, that they were increasing at the time of the hearing. They had increased from her placement. So my time— Okay, but we'll give you a little bit of time for rebuttal. We took you over. Okay. So I was just going to say that I think the crux of this is that on January 1st, 2017, that what were NG's needs and was the April 2016 IEP still appropriate and reasonably calculated to meet those needs? And that question has not been decided. Thank you. Good morning, Your Honors. May it please the Court. I'm Dan Harbottle for the Placentia-Yorba-Linda Unified School District. And starting where we left off, that question was decided. It was decided by the ALJ based on the data that she had, which was the data from the SLDC up through April 2016, which is when she was removed at the end of April. But your friend says the ALJ should have been considering NG's needs as of April 17 with respect to the new IEP. And she did that. What information did she have at that point with respect to whether residential placement was required? She had all the data that Your Honors just mentioned. From 2016? No, from the beginning of her placement there, beginning in 2016, placement at HeartSpring, through the date of the hearing, all of which showed that comparing side-by-side the student's level of progress and levels of functioning prior to HeartSpring to her levels of functioning and behavior, et cetera, once at HeartSpring, there was no question that the less restrictive SLDC program was more appropriate than HeartSpring. And you can't expect an ALJ to rule on data she doesn't have before her. There was no data. Right. She couldn't compare. She couldn't compare. She couldn't compare a non-residential program during the year when the child was somewhere else. That's right. And she is an expert. This particular ALJ has heard I don't know how many, probably 100 or more of these cases. And she was very active in the process. She asked the regional center folks who came in from they had a separate hearing, and as Your Honors all, I think, mentioned, the HeartSpring data itself, regardless of whether you look at the episodic versus the individual instances, which was raised below, the individuals at the questioning on questioning by the ALJ, the individuals from HeartSpring all admitted that her behaviors had degenerated once she was at HeartSpring. They had to install a padded wall on her bedroom. They had all sorts of problems maintaining personnel because she was hurting them and they were the turnover was tremendous. They weren't staffed with appropriately qualified people, not even at the supervisory level. And I think Your Honor said what I think is just obvious, that the family felt that they were, and they were, between a rock and a hard place with respect to the home-based circumstances prior to the placement at HeartSpring, and they had every right under the law to place her there. What they couldn't do and have tried diligently to do, and I think they've done as good a job as you can do under these circumstances, they can't transfer that liability to the district. Typically, even if we didn't have a settlement agreement, I don't think the law would support the kind of claims they're making here, but when you add on the fact that we had these three sequential settlement agreements that addressed all of these questions. Tell me in particular with respect to claims relating to the 2016 IEP because I think your friend admitted those two claims are related. If the IEP, if they hadn't given up the right to challenge the IEP, they could have done so in January. The simplest way I've come up to think about that question, which I think is a reasonable, good-faith question, is that the obligation, the release extended because the IEP extended. The IEP was released, there's no question. It was released three times, twice after it was actually put into place or at least made available to them. So the IEP on its face extended for a full year. When you say a full year, I want to interrupt you. I'm sorry, but we're talking about 2016 through 2017. Spring 16 through spring 17. Right. Most IEPs are annual IEPs. That's why. Exactly right. So the release had to extend by virtue of the fact that the IEP went beyond the December 31st end date of the agreement. It was still in effect, and so the inability to challenge it remained in effect because the IEP remained in effect. And I spent a fair amount of time during the OAH hearing, the administrative hearing, making sure that we get in the record from the dad that he understood that it was available to them and he understood that it transcended the time frame, that it extended that full year. So could the parents of any point along the way during that year have come back and placed the child? Yes, they could have. That was the whole purpose of having that IEP in place is that I think each of those settlement agreements said the parties understand and agree that the district will make an offer at an IEP in the spring of 2016 for the period post-settlement. It calls it right out in the agreement. For the period after the expiration of the agreement, we will make an offer for her to have available. If there's a dispute, which really all that means is if they decline to take that, then they can have the stay-put IEP previously offered and agreed to, and they agreed to that. So they didn't have the right to sue about it, but they had the right to dispute it in the sense that they didn't have to accept it. And then they had a fallback stay-put opportunity at SLDC, and it was, I think. They didn't have to accept it in the sense that you gave them some money to finance tuition in Kansas. That's right. Otherwise, they had to accept it. Well, no. They could do whatever they felt. Well, I mean, I'll put it differently. That was the offer. If they were going to use the district services, those would be those ones. They would be the services proposed, albeit at other places, in the 2016 IEP. And it was perfectly within the district's purview and the family's purview if they had come back after January 1, 2017, and said, we do want to bring her back, but can we have a goal, an additional goal area, or can we have a behavior intervention plan because her behaviors went through the roof and heart spring and we're worried about. Well, they could do that. They could have. But my question is, could you have said at that point, no, we settled the 2016 IEP and we'll listen to you, but you have no legal right to change? I think so. I think so. That seems to be your position in this case. Yeah, and I think we could have, and it is a hypothetical now because it didn't happen. Because nobody did. Right, but I think, in fact, we wouldn't have done so. I think we would have sat down with them and worked with them and tried to figure out a way to get her back because I think it's very clear from the overall picture of the factual picture of the case that we didn't think it was a great idea to bring her to heart spring, but we understood there was a family dynamic, a home dynamic issue, and so we paid an awful lot of money to permit the parents to help the parents get what they needed. But we always are, I think, flexible, and I think the district folks, I know that having worked with them through this period, they wanted her to come back and be at home with her sister and be at school with her sister, but it didn't work out that way. Can I ask you, and you don't have to answer it today. Well, you can answer the first one today, but not the second. Is the amount at issue that your friend says accurate? I think they're the best judge of that because we don't know how much they spent, but I think that's in the ballpark, and there have been attempts to mediate the case. I think the district feels that it went above and beyond what it might have needed to do or certainly met its obligations at every step along the way. I don't want to compel people to do what they don't want to do. I was trying to find out whether folks had considered that option. I think we may have done a Ninth Circuit mediation. I can't remember. We at least talked to the mediator on the phone about the possibility. Even accepting everything you say about how forthcoming and sensitive that the board is, it's still costing you money to litigate. If the $200,000 figure is, I couldn't actually speculate about that, but it's not just the money, and it's probably much less than that. To litigate with our fee structure with a public agency, it's much lower than you might expect. But there is a principle involved in all these cases, and you do want to ensure that you are permitted to exercise your rights as a public agency. The way I always think about this is, this is one student. There are, I don't know exactly how many in this district, but 25,000 or more. We have to protect the rights of those kids, too. So $200,000 is enormous resources for special ed teachers, speech pathologists, general ed teachers, a private school that we would fund a student, a non-public school where we would fund a student like this one. That's a lot of money for a school district to just extract from the public, from the fund, which could go to pay for other special ed kids. Well, and it's the dilemma that both sides face in these cases. There's a federal law requiring services, but not much federal money to provide them. Yeah, that's the unfunded mandate problem, yeah. The individual deserves the services under law, and the district is required to provide them. That's right. But it's coming out of the district's budget. We understand that on both sides. Exactly, exactly. Could I ask you one more question? Certainly, Your Honor. If you had offered, if they had accepted April 18th, the April 2016, or 2017, 2018, they accepted it, but at some point during this period they became unhappy, they could have asked at that point, couldn't they, for another meeting to change? Yes. Give the board notice that they wanted a change. Yes, right. That's one of the instances where we would certainly call an IEP. But they never did here, even accepting their tenuous argument. At the end of 2016, at no time did they ask you to convene another one? No. No. Even after that June 17 letter where we had offered the alternative to Portview, we had then offered the Beacon program, and we didn't get a response to that. Can I ask you a question about that period? I think it's June through September where the ALJ says, because that placement wasn't available, we're going to reimburse them for their tuition. But because that placement wasn't available, weren't they required also to pay the residential portion of the fee? No. What would they have done instead? No, but first in terms of the chronology, it was April 2017 through June. I'm sorry, I had the wrong guess. That's okay. Just for the record. No, because of Ashland, et cetera, there's many cases. No, I understand our standard of review. No, no, not the standard of review, but Ashland itself substantively says that a district is only required to pay for a residential element of a placement if it's necessary to provide education. I understand that, and I take as true for purposes of the moment the ALJ's finding that it wasn't necessary. I'm just trying to walk through this in my own mind. Okay. Where would NG have gone during that three-month period? She would have come back to the district, to the SLDC, the Speech-Language Development Center. To the previous placement. To the previous placement where she had been doing relatively well. That was available. It was available, the record's clear. Okay, I was just worried that we had a time period where no placement was available. No, there was no time. No non-residential placement was available. There was no period where there was no IEP available to her, no placement available to her. She always had one. Thank you, Your Honors. We'll give you a minute for rebuttal. So there are obviously a lot of factual intricacies with this case, but one of the things, just to piggyback off of that, was that the special ed director actually, I think, testified, and it was in the record, that she did not know if there was a space available at the Speech and Language Development Center during the spring of 2017. So Mr. Harbottle's assertion that there was a space available, that's directly contradicted, and so that was one of the points that we made was. But you rejected the IEP. Well, for that time period, because Mother called the Portview, the non-public school that was actually offered in the IEP. I guess my problem is, had you accepted it, and they couldn't place your client, the argument that you had to spend the money on residential placement would have made some sense. You didn't accept it. Because there was no space. That was one of the main. Otherwise, the IEP was acceptable? I don't know. I can't speak to that. Well, now you're challenging it now. I could just say you don't know. Yeah, I think that was, well, that was one of the main issues was that Portview did not have space, so it was kind of a non-starter. The other point is that I think that the district has really tried hard to make it seem like the reason that the parents placed Angie was because of the home situation, and that's what the ALJ found. But that ignores all of the evidence about the significant behaviors and head injuries, even to the point where she had to be evaluated for a traumatic brain injury. She had symptoms of a concussion during the 15-16 school year that led up to the settlement agreements. And my last point would just be that the parents were not represented by counsel during the time period where they executed the second two amendments to the settlement agreements. That was their choice. I want to read to you two of the findings that the ALJ made about Hartspring. Paragraph 104, he says, Hartspring staff acknowledged at the April 2, 2017 IEP meeting that the student's self-injurious and aggressive behaviors had not been controlled. And they acknowledged that in the month prior to the IEP team meeting they had seen an escalation in her behavior at the school and even more in the home. Hartspring staff acknowledged that its frequent staff changes and use of inconsistent substitute staff caused an increase in the student's maladaptive behaviors. And in an earlier paragraph on page 97, he says students' physically aggressive behaviors had increased to 1,478 instances a month. Therefore, over the 15-month period student attended Hartspring, her behaviors increased significantly for what they had been during her last few months at the development center. After more than a year at the residential treatment center, Hartspring had been unable to address the disruptive behaviors that had been the parents' reason for choosing to enroll her there. And I'll stop, but it seems to me that this was not, I understand the parents' predicament. I'm not unsympathetic. But this child should not have been at Hartspring if she may have needed a residential placement. And as I read it, the board was actually trying to help her find one in California. A group home, you mean? Yes. That would not be an educational placement. No, I know, but they were still making an effort. And I don't know how these things get paid for once the child reaches her majority. I know in New York, once the child is 18, she's no longer regarded as being a responsibility of the parent. And there's a previous governor, Governor Pataki, had taken advantage of Medicare and Medicaid to fund group homes. So, I mean, I don't know what it is in California. But in any event, they were actually trying to, they say, you want a group home for her? We'll try and find one that will put her back where she was making progress. And we'll try and find, in California, by the way, and we'll try and find a group home for her in California. The question of whether she was making progress is disputed. There's a finding of fact here. The opinion of the ALJ is fairly compelling. And I would just note that there is a system where the regional center gets funding from the Department of Developmental Services. So that was really what was going on here, was the district was wanting the regional center to bear the cost of the placement. The regional center was wanting the district to bear the cost. And so it was a finger-pointing exercise between... It's a problem because group homes cost an awful lot of money. And particularly, I mean, you see what happens when they don't pay the staff enough, which is what happened at HeartSpring. It's a constant turnover of staff, which is terrible for the children.  Can I just close by saying that... You may. I think the issue of how she did at HeartSpring is actually kind of a red herring because even if she did get worse there, the district had a responsibility as of January 1st, 2017, to assess her needs at that time and make an offer that was appropriate at that time. So if she was not making progress there, that could even be more of an argument that she required a more intensive or a different setting. And so that was all the more reason to have an IEP meeting at that time to talk about her needs. Council, we thank you. Thank you. We've taken you over. Thank you. We appreciate the briefing and argument from both sides in this case. And with that, we are adjourned. All rise. This court, for this session, stands adjourned.
judges: Hurwitz, Friedland, Korman